NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Anthony L. PEZZA and Patricia A. PEZZA, | |
| Plaintiffs, | Civ. No. 09-2097 |
| v. | OPINION |
| WELLS FARGO BANK, N.A., as Trustee, et al., | |
| Defendants. | |

THOMPSON, U.S.D.J.,

### I.  INTRODUCTION

This matter has come before the Court on the Motion for Summary Judgment [docket # 52] filed by Defendants FGC Commercial Mortgage Finance d/b/a Fremont Mortgage and Fremont Investment & Loan, Inc. (collectively, "Fremont" or "Fremont Defendants") and upon the Motion for Summary Judgment [51] filed by Defendants Litton Loan Servicing LP, Wells Fargo Bank, N.A., and HSBC Bank, USA, National Association (collectively, "Litton Defendants").  Plaintiffs Anthony and Patricia Pezza have opposed the Defendants' motions and have filed a Cross-Motion for Partial Summary Judgment [65], which both the Fremont and Litton Defendants have opposed [69, 71].  The Court has decided the motions after considering the parties' written submissions, without holding oral argument, pursuant to Fed. R. Civ. P. 78(b).  For the reasons given below, the Defendants' motions are granted in part and denied in part, and Plaintiffs' motion is denied.

## II. BACKGROUND

Plaintiffs Anthony and Patricia Pezza filed this lawsuit seeking rescission of their home mortgage and damages under the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, and damages under the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1 *et seq.* (Second Am. Compl. 4–10) [40].[1] Plaintiffs claim that their final Federal Truth in Lending Disclosure Statement ("TILA disclosure") was "misleading" because the final disclosure, as well as statements made by the closing agent, indicated a fixed-rate mortgage even though the mortgage actually had an adjustable interest rate. (*Id.* at 4.) Plaintiffs also allege consumer fraud on the grounds that the lenders engaged in unconscionable acts, predatory lending, and breach of an implied warranty of good faith. (*Id*. at 7–9.) They bring their claims against the Fremont Defendants as the lenders in the mortgage transaction and against the Litton Defendants as assignees and servicers of the mortgage.

In 2006, Plaintiffs were in substantial debt: they owed approximately $80,000 in delinquent taxes, the IRS and the State of New Jersey had filed tax liens against their property, and the State of New Jersey had garnished their bank accounts and Patricia Pezza's wages. (Fremont Defs.' Mem. in Supp. Ex. A, Anthony Pezza Dep., 15:18–16:5, 16:23–17:24) ("Anthony Pezza Dep.") [50-1]. To pay off this existing debt, Plaintiffs contacted a number of mortgage brokers to help them find a new loan, and ultimately hired Residential Loan Funding Corp. ("Residential") in March 2006. (*Id*. at 16:11–15); (*id*. Ex. B, at Wells. 0029, Mortgage Loan Origination Agreement) [50-2].

Residential provided Plaintiffs with a loan estimate form and a preliminary TILA disclosure. (*Id.* Ex. C.) [50-3]. The disclosure statement reveals that the proposed loan would contain an adjustable interest rate of 12.75% and a principal amount of $270,000. (*Id.*)

---

[1] The Second Amended Complaint [40] is the operative pleading in this case.

Residential then submitted a loan application and supporting documents to the lender, Fremont. (*Id.* Ex. D, at Wells. 0189–197, Uniform Residential Loan Application) [50-4].

Based on the application, Fremont qualified Plaintiffs for a loan with a par rate of 11.2%. Fremont then offered Plaintiffs a loan for $286,500 with an adjustable interest rate of 12.45%, and Plaintiffs accepted the offer. (*See, e.g., id.* Ex. E) [50-5]. At the closing on May 5, 2006, Plaintiffs signed a number of loan documents, including the following: (1) an "Adjustable Rate Note," (*id.* Ex. E, at Wells. 0099–0102) [50-5], (2) an "Adjustable Rate Rider," (*id.* Ex. F, at Wells. 0121–0125) [50-6], (3) an "Adjustable Rate Mortgage Loan Program Disclosure," (*id.* Ex. G, at Wells. 0007–0008) [50-7], and (4) a final "Federal Truth in Lending Disclosure Statement," (*id.* Ex. H, at Wells. 0378) [50-8].

Plaintiffs admit that they did not read some of these documents at the closing and still had not read them by the time of their depositions.[2] They also concede that their "main concern at the time" they signed the papers was paying off their existing debt. (Anthony Pezza Dep. 45:5–8.) Nevertheless, Plaintiffs claim that the last document listed—the final TILA disclosure statement—was misleading because it was inconsistent with the other loan documents and with information provided orally at the closing by the closing agent. Specifically, Plaintiffs claim that, even though the final TILA disclosure states that "Your loan contains a Variable Rate Feature," they were misled into believing the loan was for a fixed interest rate because the payment schedule lists 360 payments at $2,855.18 and because the closing agent pointed to the $2,855.18 figure and said, "This is your mortgage payment." (Pls.' Br. 24) [63]. Plaintiffs state

---

[2] The following questions and answers occurred at Mr. Pezza's deposition: "Q: Did you read through the Adjustable Rate Rider during the loan closing? A: No. . . .  Q: To this date, did you read through the Adjustable Rate Rider? A: No. . . .  Q: Did you read the [Adjustable Rate Mortgage Loan] program disclosure when you signed the document? A: No.  Have you read it up through today? A: No." (Anthony Pezza Dep., 44:14–24, 45:14–46:14.)

3

that the closing agent also "point[ed] out that there's 360 payments at [$]2,855.18." (Anthony Pezza Dep. 47:16–19.)

After the closing, Fremont disbursed the loan proceeds and Plaintiffs provided Fremont with a mortgage on their property. (*See* Fremont Defs.' Mem. in Supp. Ex. I, at Wells. 0105–0120, Mortgage) [50-9]. The broker received various fees on the transaction: $1,500 as a "broker discount point," a $350 "application fee," and $5,400 as a "yield spread premium." (*Id.* Ex. J, at Wells. 0336, Settlement Statement) [50-10].

For the next three years, Plaintiffs made monthly payments on their mortgage. (*See* Pls.' Br. Ex. E, Loan History) [63-7]. Some of these payments were late, but Plaintiffs state that they eventually made all payments owed. (Anthony Pezza Dep. 53:21–54:3.) Fremont served as the servicer of the loan from May 2006 until it assigned the loan to HSBC Bank USA, as Trustee, in September 2006. HSBC serviced the loan from then on.

On April 30, 2009, nearly three years into the loan, Plaintiffs sent a letter to the Defendants, demanding that the mortgage loan be rescinded due to TILA violations. (Fremont Defs.' Mem. in Supp. Ex. L, T.I.L.A. Rescission Notice 1–4) [50-12]. When Defendants took no steps to rescind the mortgage, Plaintiffs filed this lawsuit on May 4, 2009. They subsequently amended their Complaint to add CFA claims to the TILA claims. (Second Am. Compl. 8–10) [40]. The basis for the CFA claims is that Fremont engaged in the following unconscionable acts: (1) offering Plaintiffs a 12.45% interest rate even though they qualified for a rate of 11.2%, (2) increasing the rate from 11.2% to 12.45% even though Plaintiffs paid "broker discount points," and (3) providing Plaintiffs with a loan Fremont knew they could not afford. (Pl.'s Br. 1–2.)

In August 2009, Plaintiffs sold their property and relocated to Florida. (Anthony Pezza Dep. 56:8–19.) They sold the property "under protest" to preserve their rights in this lawsuit. (Pls. Br. 9.) With the proceeds from the sale, Plaintiffs paid off the mortgage in full. (*Id.*) Still, they maintain this action seeking a refund of the interest and closing costs on the mortgage as well as statutory damages under TILA, 15 U.S.C. § 1640, and damages under the CFA, N.J.S.A. 56:8-1 *et seq*.

Both the Fremont and Litton Defendants have now moved for summary judgment on all claims. Plaintiffs have cross-moved for summary judgment on their TILA claim.

## III. ANALYSIS

### A. Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court will "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." *Id.*; *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). More specifically, the Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant's motion is supported by facts, the party opposing

5

summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). More than a mere "scintilla of evidence" supporting the non-moving party is required. *Anderson*, 477 U.S. at 252. Properly applied, Rule 56 will "isolate and dispose of factually unsupported claims or defenses" before those issues come to trial. *Celotex*, 477 U.S. at 323–24.

**B. Plaintiff's TILA Claims**

Plaintiffs claim that the final TILA disclosure statement violated the requirements of the Truth in Lending Act because it was inconsistent with the preliminary TILA disclosures and the information provided orally by the closing agent. Because we find that Plaintiffs have failed to make an adequate showing that the final TILA disclosure was misleading, inconsistent, or otherwise in violation of TILA, we will grant summary judgment in favor of the Defendants on these claims.

1. Legal Framework for TILA Rescission Claim

Congress enacted TILA to promote consumers' "informed use of credit" by requiring creditors to provide "meaningful disclosure of credit terms," 15 U.S.C. § 1601(a); *Williams v. Wells Fargo Home Mortg., Inc.*, 410 F. App'x 495, 498 (3d Cir. 2011). To that end, TILA and its implementing regulations—"Regulation Z" or "Reg. Z"—provide that, for transactions "in which a security interest is or will be retained or acquired in a consumer's principal dwelling," a borrower has a "right to rescind the transaction" for up to three days. 15 U.S.C. § 1635(a); *see also* 12 C.F.R. § 226.23(a)(1) ("Regulation Z"). This three-day right to rescind is extended to three years, however, if the creditor fails to provide the borrower with the material disclosures or if the disclosures are inaccurate. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 411 (1998) (citing 15 U.S.C. § 1635); *Williams*, 410 F. App'x at 498 (citing 12 C.F.R. § 226.23(a)(3) and 15 U.S.C. §

1635(f)).  Because Plaintiffs waited almost three years before filing this lawsuit, their right to rescind the mortgage has already expired unless they can prove that Defendants failed to provide the material disclosures or that the disclosures were inaccurate.

Among the required Reg. Z disclosures, a lender must disclose if an interest rate is variable.  *See, e.g.,* 12 C.F.R. § 226.19(b)(2)(i) (lender must disclose "[t]he fact that the interest rate, payment, or term of the loan can change"); 12 C.F.R. § 226.18(f)(2) ("If the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year," lender must disclose: "(i) The fact that the transaction contains a variable-rate feature . . . .").  Furthering TILA's purpose "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit," creditors must disclose all material information "clearly and conspicuously."  15 U.S.C. § 1601(a).  The clear and conspicuous standard requires that the "disclosures be in a reasonably understandable form." 12 C.F.R. § 226.17(a)(1), Commentary ¶ 1 (available at http://www.fdic.gov/regulations/laws/ rules/6500-2300.html).  The Third Circuit has stated that "the requirement that disclosures be 'reasonably understandable' does not require that they be understandable by the average consumer . . . [but] must be reasonably understandable 'in light of the inherent difficulty or complexity of the' information disclosed." *Rossman v. Fleet Bank (R.I.) Nat. Ass'n*, 280 F.3d 384, 394 n.9 (3d Cir. 2002) (citations and quotations omitted); *see also Melfi v. WMC Mortg. Corp.*, 568 F.3d 309, 312 (1st Cir. 2009) ("Our test is whether any reasonable person, in reading the [disclosure] form provided . . . , would so understand it.").  In *Rossman*, however, the court stated "there is nothing complex about annual fees, so the intended audience is the ordinary consumer[,]" and the court then used the ordinary consumer standard in measuring the

7

disclosures at issue in that case. *Id.* Similarly, we find nothing complex about the difference between a variable rate and a fixed rate, so we will use the ordinary consumer standard as our guide.

      2.  <u>Plaintiffs' Claim that the Final TILA Disclosure Form was Misleading</u>

Using the ordinary consumer standard, we now turn to the alleged TILA violations Plaintiff asserts. First, Plaintiff states that the Final TILA disclosure was itself misleading, or at least misleading when compared to prior TILA disclosures, because it lists 360 monthly payments at $2,855.18, and does not show that the payment could change if the interest rate varied. In contrast, two preliminary TILA disclosures contain estimated payment schedules that showed varying monthly payments based on speculative changes to the interest rate. Plaintiffs argue that an average consumer could be misled to believe that the interest rate was fixed based on the payment schedule in the final disclosure compared to the previous two. We find this argument unavailing. To begin with, Defendants correctly point out that the commentary to Reg. Z states that, for variable-rate transactions, "[c]reditors should base the disclosures only on the initial rate and should not assume that this rate will increase." 12 C.F.R. § 226.17(c)(1), Commentary ¶ 8 (available at http://www.fdic.gov/regulations/laws/rules/6500-2300.html). It would thus appear that, for the final TILA disclosure, any payment schedule that showed estimated changes in payments over time would run afoul of Reg. Z. Even assuming, however, that an ordinary consumer could be misled by looking at the payment schedule in isolation, it is clear that no ordinary consumer would be misled when looking at the TILA disclosure form as a whole. Directly below the allegedly misleading payment schedule is a line reading, "Your loan contains a Variable Rate Feature. Disclosures about the Variable Rate Feature have been provided to you earlier," and the box below that is marked "Yes." (Pls.' Br. Ex. H) [63-10].

And even if an ordinary consumer could harbor any lingering doubt after reading the complete form, such doubt would be quickly dispelled by reading any one of the other closing documents indicating an adjustable rate mortgage, including: (1) the "Adjustable Rate Note," (Fremont Defs.' Br. in Supp. Ex. E, at Wells. 0099–0102) [50-5], (2) the "Adjustable Rate Rider," (*id.* Ex. F, at Wells. 0121–0125) [50-6], and (3) the "Adjustable Rate Mortgage Loan Program Disclosure," (*id.* Ex. G, at Wells. 0007–0008) [50-7]. *See Roberts v. Fleet Bank (R.I.) Nat. Ass'n*, 342 F.3d 260, 268 (3d Cir. 2003) (concluding "that the TILA permits us to consider materials outside of the [disclosure form] in determining whether the credit issuer disclosed the required information clearly and conspicuously"). In the face of this overwhelming evidence that the interest rate was variable, we find that Plaintiff has failed to raise a genuine question about whether the final TILA disclosure was misleading in itself. It clearly was not.

    3. Plaintiffs' Claim of Misleading Oral Information

Plaintiffs' second alleged TILA violation is that the final TILA disclosure was misleading in light of the statements made by the closing agent at the closing, including pointing to the $2,855.18 figure and saying, "This is your mortgage payment," and "point[ing] out that there's 360 payments at [$]2,855.18." (Anthony Pezza Dep. 41:13–18, 47:16–19.) Plaintiffs' position is that these inconsistent oral statements made the TILA disclosure misleading even if the form was not misleading in itself. (Pls.' Br. 22.) True, a lender's oral statements inconsistent with the written disclosure can create TILA liability. *See, e.g., Ramanujam v. Reunion Mortg., Inc.*, Civ. No. 09-3030, 2011 WL 446047, at *3 (N.D. Cal., Feb. 3, 2011) ("When a consumer has received inaccurate information from the lender . . . , the provision of a compliant TILA form may not always be sufficient to counteract clearly and conspicuously the misinformation . . . ."); *Jenkins v. Landmark Mortg. Corp. of Va.*, 696 F. Supp. 1089, 1094 (W.D. Va. 1988) (extending

9

rescission period where "oral representations . . . were erroneous and misled plaintiff"). However, Plaintiffs' argument fails for two reasons.

First, the closing agent's statements are not necessarily inconsistent. The statement, "This is your mortgage payment," is truthful: $2,855.18 was Plaintiff's initial monthly payment and the guaranteed payment for the first two years of the loan. And, as it turned out, the interest rate never changed for the entire time Plaintiffs held the loan. (Anthony Pezza Dep. 56:3–7.) What is more, the closing agent never said that the loan contained a fixed rate. Plaintiffs would have us find, nevertheless, that the closing agent's statements were misleading because "[s]he never once mentioned an adjustable rate." (Pls.' Br. 24) (emphasis in original). But it is unimaginable that an ordinary consumer—signing multiple documents clearly indicating an adjustable rate—would be misled simply because the closing agent never reiterated what the disclosures already made plain. Moreover, if the Reg. Z commentary mandates that the written disclosures be based "only on the initial rate and should not assume that this rate will increase[,]" 12 C.F.R. § 226.17(c)(1), Commentary ¶ 8, then we see no reason why a closing agent would speculate about theoretical future payments.

Second, even if we believed that the closing agent's oral statements could be misleading, the Defendants are not liable for the actions of a closing agent who is neither their employee nor their agent. As we said, case law does support finding a TILA violation where borrowers were provided inconsistent oral information, but the misleading oral information must be provided by the lender or an agent of the lender. *See Rivers v. Credit Suisse Boston Fin. Corp.*, Civ. No. 05-6011, 2007 WL 1038567, at *6 (D.N.J. Mar. 30, 2007) (finding that closing agent was agent of borrower and his actions could not be attributed to lender); *In re Bumpers*, Civ. No. 03-111, 2003 WL 22119929, at *8 (N.D. Ill. Sept. 3, 2003) (finding lender not responsible for inaccurate

10

disclosure statement provided by mortgage broker because Plaintiff "was unable to produce any evidence of an agency relationship between" lender and broker).

In this case, Plaintiffs have provided no evidence that would demonstrate an agency relationship between the Defendants and the closing agent, Kathleen Young. Instead, it appears that Ms. Young was the Vice President of All-Pro Title, (Fremont Defs.' Reply Br. Ex. 4, Patricia Pezza Dep., 11:3–17) [70-4], and that All-Pro Title was retained by another third party, Stewart Title Company, whose services were paid for by the Plaintiffs themselves, (*Id.* Ex. 5, at Wells. 0328) [70-5]. For Plaintiffs to succeed on this claim, they would need to show that an agency relationship existed between Ms. Young and the Defendants. There is simply no evidence of that in the record.

For all the reasons discussed above, we find that Plaintiffs have not presented sufficient evidence that an ordinary consumer would be misled. Therefore, no triable issue of fact exists on Plaintiffs' TILA claims and the Defendants are entitled to summary judgment.

### C. Plaintiffs' New Jersey Consumer Fraud Act Claims

New Jersey's Consumer Fraud Act ("CFA") states that it is unlawful for any person to use or employ: "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid . . . ." N.J.S.A 56:8–2. "[L]ike most remedial legislation, the [CFA] should be construed liberally in favor of consumers." *Cox v. Sears Roebuck & Co*., 647 A.2d 454, 461 (N.J. 1994). To state a claim under the CFA, a plaintiff must show: "(1) unlawful conduct by defendant; (2) an ascertainable loss by plaintiff;

and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bonnieview Homeowners Ass'n v. Woodmont Builders*, 655 F. Supp. 2d 473, 503 (D.N.J. 2010) (quoting *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009).

Plaintiffs allege three separate "unconscionable practices" engaged in by the Fremont Defendants: (1) offering Plaintiffs a 12.45% interest rate even though they qualified for a par rate of 11.2%, (2) increasing the rate from 11.2% to 12.45% even though Plaintiffs paid "discount points," and (3) providing Plaintiffs with a loan Fremont knew they could not afford. (Pl.'s Br. 1–2.) Plaintiffs add that these unconscionable practices also violated an implied covenant of good faith and constituted predatory lending. (*Id.*) We address each alleged unlawful act separately, and conclude that a genuine issue of material fact exists as to the second and third claims. Therefore, we will deny summary judgment on these claims.

1.  Charging a Rate Above the Par Rate

Plaintiffs' first allegation is that Fremont initially qualified Plaintiffs for an 11.2% interest rate, but at closing, offered Plaintiffs an interest rate of 12.45%. According to Plaintiffs, the only reason for the 1.25% increase was that the broker wanted more money. (Pls.' Br. 13.) They point out a handwritten note in Fremont's file stating, "12.45 wants 2 ysp," which they understand to mean that the rate was increased because the mortgage broker wanted a "yield spread premium" fee of $5,400. (Pls.' Br. 13 (citing *id*. Ex A, at Wells 0072) [63-3].) Plaintiffs characterize this as "gouging." (*Id.*)

Defendants counter that there is nothing unconscionable about including a yield spread premium in the offered rate. (Fremont Defs.' Reply Br. 7.) A "yield spread premium" is:

> a bonus paid to a broker when it originates a loan at an interest rate higher than the minimum interest rate approved by the lender for a particular loan. The lender then rewards the broker by paying it a percentage of the "yield spread" (*i.e.*, the difference

>between the interest rate specified by the lender and the actual interest rate set by the broker at the time of origination) multiplied by the amount of the loan.

*Rivers*, 2007 WL 1038567, at *2 n.2 (quoting *In re Bell*, 309 B.R. 139, 153 (Bankr. E.D. Pa. 2004)).

In this case, the minimum interest rate Plaintiffs qualified for—the "par rate"—was 11.2%. Plaintiffs would have us believe that it was unconscionable for Fremont to offer Plaintiffs anything other than that par rate. But they have presented no authority to support this proposition. Defendants, on the other hand, cite numerous cases upholding the inclusion of a yield spread premium where it was properly listed on the HUD Settlement Statement. (Fremont Defs.' Reply Br. 7–9); *see, e.g. Nelson v. Maverick Funding Corp.*, Civ. No. 08-6390, 2011 WL 1045117, at *4 (D.N.J. Jan. 6, 2011) ("Courts in this district have found that YSPs are not illegal if they are 'earned' in accordance with § 8(c) [of RESPA].") [3]; *Warburton v. Foxtons, Inc.*, Civ. No. 04-2474, 2005 WL 1398512, at *5 (D.N.J. Jan. 13, 2005) (same); *Rivers*, 2007 WL 1038567, at *5 (finding yield spread premium was not required material disclosure of TILA finance charge). Here, the existence of the yield spread premium was clearly disclosed to the Plaintiffs on the Settlement Statement, (Femont Defs.' Mem. in Supp. Ex J) [50-10], and Plaintiffs were expressly advised that "if the lender pays your broker a yield spread premium, your interest rate will be higher than the base interest rate for which you would otherwise qualify." (Fremont Defs.' Reply Br. Ex. 2) [70-2]. Plaintiffs have not presented, and we could not find, any other reason why the inclusion of the yield spread premium here would be unconscionable. Thus, we will grant summary judgment to the Fremont Defendants on this claim.

---

[3] We do not address whether the fee was "earned" under § 8(c) of the Real Estate Settlement Procedures Act ("RESPA") because the Complaint fails to allege a RESPA claim.

2. Broker Discount Points

The second fraud allegation concerns what is known as a "broker discount point." Plaintiffs paid $1,500 in broker discount points at closing. They argue that, by definition, the payment of a broker discount point should have reduced—"discounted"—the interest rate; instead, Fremont unconscionably raised the interest rate. (Pls.' Br. 14.) The Fremont Defendants counter that New Jersey has created a statutory distinction between a "broker discount fee" and a "broker discount point": the former may require a reduction of the interest rate but the latter is simply another type of fee that a mortgage broker may charge for its services. (Fremont Defs.' Reply Br. 14.)

Plaintiffs' position is primarily based on a similar case out of state court in Michigan, *Vandenbroeck v. CommonPoint Mortg. Co.*, No. 236642, 2004 WL 1778933 (Mich. Ct. App. Aug. 10, 2004). In the mortgage transaction at issue in *Vandenbroeck*, the lender had charged the borrowers a fee for a "loan discount." The borrowers argued that this contract term "required a discounted interest rate in exchange for the fee." *Vandenbroeck*, 2004 WL 1778933, at *1. The lenders argued, instead, that the term "should be defined as a fee paid simply to increase the lender's yield." *Id*. at *3. The Michigan Court of Appeals held "that the contract term 'loan discount fee' is subject to only one reasonable interpretation. It cannot be construed as anything other than a fee paid to reduce the interest rate on the loan." *Id*. at * 2. The Court found that this reading of the contract language "comport[ed] with the common mortgage trade or industry meaning of loan discount point or fee" as a "premium paid for obtaining a lower mortgage rate." *Id*.

Defendants counter that *Vandenbroeck* is not applicable to this case because it did not deal with a New Jersey mortgage loan. Defendants argue that, in New Jersey, a "broker discount

14

point" is different from a "discount fee" or any other type of discount that would reduce the mortgage interest rate.  They base this argument on two grounds.  First, Defendants point out that under N.J.S.A. 17:11C-74, "a residential mortgage broker, incidental to the brokering of any mortgage loan transaction, shall have the right to charge only the following fees: (1) application fee; and (2) discount points."  N.J.S.A. 17:11C-74(b).  Defendants contend that, because the "discount point" is a fee "incidental to the brokering of any mortgage loan transaction," it is not tied in any way to the interest rate of the loan.  (Fremont Defs.' Reply Br. 12.)

Second, Defendants argue that, under federal regulations, if the "discount point" defined in N.J.S.A. 17:11C-74b provided for a reduction of the mortgage rate, then Plaintiffs' payment of the discount points would have been recorded on Line 802 of the Settlement Statement required by the Department of Housing and Urban Development ("HUD").  Under the federal regulations in place at the time of this mortgage, "Line 802 [of the HUD Settlement Statement] is used to record the loan discount or 'points' charged by the lender . . . ."  14 C.F.R. 3500, App. A (2006).  And "discount points" are defined as "a one-time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to [the borrower]."  (*See* Fremont Defs.' Reply Br. 13 (quoting HUD booklet made available to borrowers pursuant to 24 C.F.R. § 3500.6).)  The $1,500 Plaintiffs paid in broker discount points was not listed on Line 802.  Instead, it is listed under Line 807 as "Broker Discount Point to: Residential Home Funding."  (Pls.' Br. Ex. M.)  Accordingly, Plaintiffs argue that it could not be a discount that would reduce the interest rate.

We conclude, however, that there is a genuine issue of material fact as to the meaning of "broker discount point" in this New Jersey mortgage loan.  The New Jersey statute does not define the term, and the parties experts have come to opposite conclusions about its meaning in

15

the New Jersey mortgage industry. In light of the competing evidence, the Court is not in a position to rule as a matter of law on the meaning of the term in this transaction, and accordingly, we will deny summary judgment on this claim.

### 3. Affordability of the Loan

Finally, Plaintiffs argue that Fremont engaged in predatory lending practices, which they claim constitute an unconscionable act under the CFA. Plaintiffs believe the "Pezza loan was inherently 'predatory', simply because it was unaffordable." (Pls.' Br. 14.) New Jersey courts have described "predatory lending" as:

> a mismatch between the needs and capacity of the borrower . . . In essence, the loan does not fit the borrower, either because the borrower's underlying needs for the loan are not being met or the terms of the loan are so disadvantageous to that particular borrower that there is little likelihood that the borrower has the capability to repay the loan.

*Nowosleska v. Steele*, 946 A.2d 1097, 1101 (N.J. Super. Ct. App. Div. 2008) (quoting *Assocs. Home Equity Servs., Inc. v. Troup*, 778 A.2d 529, 536–37 (N.J. Super. Ct. App. Div. 2001)). "Predatory lending often involves circumstances in which the lender engages in fraudulent activity in order to induce borrowers to take on 'bad loans,' including 'loans that are overpriced, loans where there is no net economic benefit to the borrower, loans where the borrower cannot afford the payment so the lender is relying on the borrower's equity for payment, and loans with other exploitative terms not understood by the borrower." *Fin. Freedom Senior Funding Corp. v. Fischer*, No. L-5900-08, 2011 WL 1161123, at *6 (N.J. Super. Ct. App. Div. Mar. 31, 2011) (citing *Nowosleska*, 946 A.2d at 1101 n.3) (internal quotation marks omitted).

Plaintiffs give several reasons why the loan was unaffordable: (1) the Fremont mortgage had a monthly payment that was more than $500 greater than their prior mortgage; (2) Plaintiffs made several late payments on the mortgage; and (3) Plaintiffs' expert believes the loan was unaffordable based on her calculation of the Plaintiffs' debt and income levels. (Pls.' Br. 14–

15.) For these reasons, Plaintiffs argue that it was inevitable that they would default on their mortgage and Defendants knew or should have known this.

Defendants argue, however, that there is no issue of material fact because Plaintiffs have essentially conceded that the loan was affordable to them. (Fremont Defs.' Reply Br. 6.) First, Plaintiffs knew that the mortgage payment would be $2,855.18 when they signed the loan documents. (Anthony Pezza Dep. 17:14–17 ("Q. And did you feel at the time that you signed the loan papers with Fremont that you could afford to pay $2,855.18 per month? A. Yes.")) [50-15]. Second, this amount never changed over the entire time the Plaintiffs held the loan. (*Id.* at 93:12–15 ("Q. Did your principal and interest payment ever change between the time that you signed this document and the time that you sold the property? A. No.")) [50-1]. Third, Plaintiffs made all loan payments. (*Id.* at 53:21–23 ("Q. Did there come a time when you stopped making your mortgage payments? A: No.").) And finally, Plaintiffs sold the property for reasons unrelated to the affordability of the loan. (*Id.* at 56:8-19 ("Q: What was the reason that you sold the property? A. What was the reason? The reason was my last we had four kids; three went through college . . . . The house was too big; we wanted to downsize. We wanted to buy a little something in Florida . . . .").) Defendants argue that the Court should not accept the testimony of Plaintiffs' expert that the loan was unaffordable when it is clear that Plaintiffs themselves believed the loan was affordable.

Although we give strong weight to the deposition testimony in which Plaintiffs essentially admit that the loan was affordable, we cannot say as a matter of law that the loan "fit the borrower." *Nowosleska*, 946 A.2d at 1101. Instead, there is a genuine issue of material fact as to whether "the borrower's underlying needs for the loan [were] not being met or the terms of the loan [were] so disadvantageous to that particular borrower that there is little likelihood that

the borrower [had] the capability to repay the loan." *Id*. Plaintiffs have procured the testimony of an expert who concludes based on her analysis that the loan was unaffordable. Defendants' expert disagrees. It is not our role, however, to weigh the credibility of the experts at this stage of the litigation. Accordingly, we deny summary judgment as to this claim as well.

## IV. CONCLUSION

For the reasons given above, we will grant summary judgment in favor of all Defendants on Plaintiffs' TILA claims. We will deny summary judgment on Plaintiffs' claims that the Fremont Defendants engaged in unconscionable business practices that violate the CFA by charging a broker discount point without reducing the mortgage interest rate and by providing Plaintiffs with a possibly unaffordable loan. The CFA claims were not asserted against the Litton Defendants, so these parties will be dismissed. Also, in light of this Opinion, we will dismiss the Plaintiffs' pending motion for reconsideration [72] as moot. The parties are directed to confer with one another to reach an agreement about what materials are an appropriate part of the record going forward. Any disputes will be resolved at a later time. An appropriate order will follow this opinion.

DATE: August 30, 2011

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.